**TARTER KRINSKY & DROGIN LLP**
*Proposed Attorneys for Axia Realty, LLC*
*Debtor and Debtor-in-Possession*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Scott S. Markowitz, Esq.
smarkowitz@tarterkrinsky.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
In re: :
: Chapter 11
AXIA REALTY, LLC :
: Case No.: 20-12511 (MG)
Debtor. :
------------------------------------------------------------- x

**MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO SECTION 364(d) OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001 AND 9014 AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING SECURED BY A SENIOR LIEN ON THE DEBTOR'S REAL PROPERTY**

TO: THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

Axia Realty, LLC, debtor and debtor-in-possession (the "Debtor"), by and through its proposed undersigned counsel, submits this motion (the "Motion") for entry of interim and final orders (the "Financing Order(s)"), authorizing the Debtor (i) to obtain postpetition secured financing pursuant to section 364(d) of Title 11, United States Code (the "Bankruptcy Code") and Federal Rules of Bankruptcy Procedure 4001 and 9014 (the "Bankruptcy Rules") and Local Bankruptcy Rule 4001-2, and (ii) to grant certain other related relief consistent with the term sheet annexed hereto as **Exhibit A** (the "Term Sheet"). In support of the Motion, the Debtor respectfully represents as follows:

{Client/086975/1/02229076.DOC;4 }

## GENERAL BACKGROUND

1. On October 26, 2020 (the "Petition Date"), the Debtor filed a voluntary Chapter 11 petition with the clerk of this Court. No trustee or examiner has been appointed in this case. No official committee of unsecured creditors has yet been appointed. Since the Petition Date, the Debtor has continued in the possession of its assets and in operation of its business as a debtor-in-possession.

2. The Debtor is the sponsor of a boutique luxury condominium development located at 40 East 72nd Street, New York, NY (the "Property"). Commencing in or about 2014, the Debtor embarked on a total gut renovation of the Property and converted the Property into a six-unit condominium development.

3. The Debtor's sole equity interest holders are Antonia Milonas ("Antonia") and Spiros Milonas ("Spiros"). Antonia and Spiros are married. Antonia is currently acting as the Debtor's sole manager due to Spiros having been judicially declared incapacitated and unable to manage his own affairs by order of the New York State Supreme Court. Pursuant to Article 81 of the Mental Hygiene Law, the Court appointed a guardian of Spiros' property.

4. Prior to Spiros being judicially declared incapacitated and unable to manage his own affairs, the Debtor in 2017 sold three of its condominium units to arm's length purchasers and realized total net proceeds of approximately $35 million. From the sale proceeds, the Debtor's construction loan was fully paid and the Debtor retained approximately $4 million in excess sale proceeds. These proceeds were paid to an affiliate of Spiros' business controlled by his adult daughters from his prior marriage. Antonia did not consent to the transfer of these monies.

5. This left the Debtor with little or no working capital. As a result, the Debtor fell behind on its obligations to pay common charges and real estate taxes on its retained units. The Debtor still owns Unit 1(approximately 3,400 square foot duplex with outdoor space), Unit1A (a small studio office on the first floor), Unit 2 (approximately 3,100 square foot, three bedroom) and Unit 6 (approximately 5,900 square feet). Antonia and Spiros reside in Unit 6 which is a triplex penthouse.

6. Prior to the Covid-19 pandemic, the Debtor obtained an opinion of value from a real estate broker with the Corcoran Group with respect to its retained units. Unit 1 was valued at $11,000,000, Unit 1A at $1,750,000, Unit 2 at $10,000,000 and Unit 6 at $23,000,000 (see **Exhibit B**.). Although the Covid-19 pandemic has likely affected these values, the Debtor's units retain substantial value. The Debtor's units are not subject to a consensual mortgage.

7. As a result of the Debtor's failure to pay common charges on its retained units, the other three non-sponsor unit owners got together and commenced a lawsuit in New York State Supreme Court seeking various forms of relief against the Debtor. In addition, the condominium board filed actions seeking to foreclose its liens for unpaid common charges against the Debtor's units.

8. The state court granted some relief to the non-sponsor unit owners including giving them de facto control of the condominium board by expanding their voting rights for most corporate actions.

9. The Debtor's inability to pay outstanding common charges on its units has had a devastating effect upon the building's operations as the Debtor's common charges represent approximately 60% of the overall monthly common charges. The non-sponsor unit owners have been required to fund certain shortfalls to maintain the Property. In addition, the Debtor has

failed to pay real estate taxes to the City of New York on its units and these unpaid real estate taxes accrue interest at approximately 18% per year.

## THE DEBTOR'S URGENT NEED TO OBTAIN FINANCING

10. The Debtor currently has no cash. The Debtor needs to obtain financing to pay the outstanding common charges of approximately $461,000 which are a lien on the Debtor's Property and accrue interest and have the ability to pay current and future common charges which are required in order to get approval from the AG's Office to be able to sell the remaining units. Annexed hereto as **Exhibit C** is a summary statement of the unpaid common charges on each of the Debtor's units. The condominium association is in great need of funds to pay ordinary expenses such as salaries to the doorman and porters, elevator maintenance, insurance and the like. It is simply unfair and untenable for the other unit owners to continue to fund these shortfalls.

11. The Debtor also requires funds to update and amend the condominium offering plan and to perform certain minor repairs to its units so they can be marketed as necessary (except for Unit 6) when the Debtor obtains approval from the New York State AG's office to reinstate the condominium offering plan (the "Offering Plan"). The Debtor also needs monies to pay current common charges and to clean up the outstanding real estate taxes on its units and to pay the costs of the Chapter 11 case.

12. In short, the Debtor is in desperate need of funds to do what is required to remedy all issues with respect to its obligations as sponsor and properly market one or more of its remaining units to pay its creditors and/or to make distributions to its equity interest holders. Additionally, the Debtor requires funds to pay professional fees to pursue recovery of potential avoidable transactions.

13. Without the ability to obtain postpetition financing, the Debtor will not be able to ensure that its postpetition operating expenses are met in the ordinary course of its business which will continue to jeopardize the viability of the building; unfairly prejudice the non-sponsor unit owners and further depress the value of all units in the building.

14. The Debtor has determined, in the exercise of its business judgment, that it requires postpetition financing in the amount of approximately $3 million to have sufficient capital to meet its long past due secured obligations and to perform its obligations as a sponsor on an ongoing basis during the Chapter 11 case. Of that amount, the Debtor needs approximately $500,000 on an immediate basis to pay the outstanding common charges and other expenses associated with the proposed debtor-in-possession financing. Without payment of the common charges, the Debtor will likely suffer irreparable harm.

## RELIEF REQUESTED

15. Accordingly, the Debtor requests the Court (a) approve, after notice and a hearing pursuant to Bankruptcy Rules 4001 and 9014, an agreement (the "DIP Loan Agreement"), a copy of which is annexed hereto as **Exhibit D**, providing for financing (the "DIP Financing") of up to $3 million by Michael Katz Profit Sharing Plan ("Katz" or "DIP Lender") in its capacity as postpetition lender and (b) grant the Debtor immediate access to the DIP Financing on an interim basis so that it can pay the outstanding common charges of approximately $461,000 as soon as possible.[1]

16. The Motion contemplates a bifurcated procedure whereby the proposed Financing Order, a copy of which is annexed hereto as **Exhibit E**, will initially be entered as an interim

---

[1] In the interest of full disclosure, Katz is a client of Tarter Krinsky & Drogin LLP ("TKD"), Debtor's proposed counsel. Katz in the past has made at least one loan to a client of TKD. Katz has retained separate counsel with respect to this transaction.

order, and the relief granted therein will be granted on interim basis and following an opportunity to object a final hearing and upon approval, the Financing Order would become final.

**PREPETITION INDEBTEDNESS**

17. As of the Petition Date, the Debtor was indebted to the condominium association in the amount of approximately $461,000 which includes late fees and legal fees which are due and owing under the Condominium by-laws and offering plan. In addition, the Debtor owes outstanding real estate taxes to the City of New York on its units in the approximate amount of $550,000. The Debtor is also subject to a questionable judgment in the amount of $2,226,599 entered via confession in favor of Phoenix Capital Finance Limited (the "Phoenix Judgment"), an affiliate of Spiros' business entity, which is controlled by Spiros' daughters. The Phoenix Judgment constitutes a judicial lien against the Debtor's units. The Debtor also allegedly owes various disputed unsecured notes to other affiliates controlled by Spiros' daughters and some trade debt, the bulk of which consists of disputed professional fees.

**MATERIAL TERMS OF THE DIP LOAN AGREEMENT**

18. After extensive arm's length negotiations with multiple potential lenders,[2] the Debtor selected Katz as the DIP Lender pursuant to the terms and conditions of the DIP Loan Agreement. The Debtor respectfully refers the Court to the DIP Loan Agreement for a full recitation of the terms and conditions of the DIP Financing. However, the following are certain of the key provisions of the DIP Loan Agreement which are required to be set forth pursuant to Bankruptcy Rule 4001(c)(1)(B) and Local Bankruptcy Rule 4001-2(a) including interest rate, maturity, events of default, liens, borrowing limits and borrowing conditions. The principal terms of the DIP Loan Agreement are as follows:

---

[2] The Debtor obtained a total of 7 DIP loan term sheets since the Petition Date.

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Borrower** <br> Bankruptcy Rule 4001(c)(1)(B) | Axia Realty, LLC <br> *See* DIP Term Sheet at p. 1 |
| **DIP Lender** <br> Bankruptcy Rule 4001(c)(1)(B) | Michael Katz Profit Sharing Plan <br> *See* DIP Term Sheet at p. 1 |
| **Term** <br> Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The earlier of the closing of the sale of a condominium unit or 24 months from entry of the Financing Order subject to termination rights upon an Event of Default. <br> *See* DIP Term Sheet at p. 1 <br> *See*, DIP Loan Agreement section 2.2 at p. 6 |
| **Amount of Loan** <br> Bankruptcy Rule 4001(c)(1)(B) | Up to $3 million with up to $500,000 on interim basis. <br> *See* DIP Term Sheet at p. 1 <br> *See*, DIP Loan Agreement section 2.1 at p. 5 |
| **Conditions of Borrowing** <br> Bankruptcy Rule 4001(c)(1)(B) | The DIP Loan Agreement obtaining court approval as well as entry of an acceptable Financing Order and no Events of Default shall have occurred. <br> *See* DIP Term Sheet at p. 2 <br> *See*, DIP Loan Agreement section 3.5 at p. 8 |
| **Interest Rate** <br> Bankruptcy Rule 4001(c)(1)(B) | 9.5% per annum simple interest only. Interest payments due monthly. <br> *See* DIP Term Sheet at p. 2 <br> *See*, DIP Loan Agreement section 3.2 at p. 7 |
| **Use of DIP Financing** <br> Bankruptcy Rule 4001(b)(l)(B)(ii) | Solely for the following: <br><br> a. Payment of all unpaid prepetition common charges; <br> b. Payment of all unpaid real estate taxes; <br> c. Payment of ongoing operating expenses including postpetition common charges; <br> d. Payment of Chapter 11 professional fees subject to Court approval; <br> e. Payment of United States Trustee's fees; <br> f. Payment of any necessary construction and/or remediation of the Debtor's units or other work required by the Debtor as sponsor. <br> g. Payment of DIP Lender's professional fees, mortgage recording tax and other fees under the DIP Loan Agreement. <br> *See* DIP Term Sheet at 2. <br> *See*, DIP Loan Agreement section 2.4 at p. 6 |
| **Granting of Liens** <br> Bankruptcy Rules 4001(b)(l)(B)(i) | DIP Loan Agreement provides for a senior priming lien secured by a mortgage on the Debtor's units pursuant to section 364(d)(1). The DIP Loan Agreement provides for a senior mortgage on the Debtor's retained condominium units. <br> *See* DIP Term Sheet at 2. <br> *See*, DIP Loan Agreement section 3.3 at p. 7 |

| **Fees**<br>Bankruptcy Rule<br>4001(c)(1)(B) | a. 2% of the loan amount paid out of Tranche B;<br>b. The DIP Lender's professional fees in preparing the DIP Loan Agreement and related documents;<br>c. Mortgage recording tax<br>*See* DIP Term Sheet at 2.<br>*See*, DIP Loan Agreement section 3.2(d) at p. 7 |
|---|---|
| **Events of Default**<br>Bankruptcy Rule<br>4001(c)(l)(B) | a. Customary bankruptcy events of default including conversion or dismissal of case or appointment of a trustee;<br>b. Reversal or modification of Financing Orders;<br>c. Payment default<br>*See* DIP Term Sheet at 2.<br>*See*, DIP Loan Agreement section 7 at p. 12-13 |

## **BASIS FOR RELIEF REQUESTED**

**I. The Debtor Should Be Authorized to Obtain Postpetition Financing Through the DIP Loan Agreement**

**A. Entry into the DIP Loan Documents Is an Exercise of the Debtor's Sound Business Judgment.**

19. The Court should authorize the Debtor, as an exercise of its sound business judgment, to enter into the DIP Loan Agreement and obtain access to the DIP Financing. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See*, *e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the

court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

20. Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

21. Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the debtor offered by a proposed postpetition loan. For example, in *In re ION Media Networks. Inc.*, former bankruptcy Judge Peck from this district stated that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of*

> *closing, the impact on creditor constituencies and the likelihood of a successful reorganization.* This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

22. The Debtor's determination to move forward with the DIP Financing is an exercise of its sound business judgment following an arm's-length process and careful evaluation. See ¶¶ 7, 10 & 11 of Declaration of Antonia Milonas (the "Antonia Declaration"). Specifically, the Debtor through its proposed counsel contacted at least eight potential DIP lenders. The Debtor requested each of the proposed lenders submit a term sheet or at minimum a summary of material loan terms. All the potential lenders required a senior mortgage on the Debtor's retained condominium units at the Property in order to make a loan. The DIP Financing is essentially a mortgage loan from a secondary mortgage lender. The Debtor and its professionals carefully reviewed the various proposals and selected the DIP Lender's proposal. The Debtor believes the total cost of the funds under the DIP Loan Agreement to be approximately 10.5% for the full 24-month period is fair and reasonable based upon the current market. Additionally, the Debtor requires immediate funding in order to pay common charges, real estate taxes, professional fees and other necessary expenses associated with its obligations as a condominium sponsor.

### B. The Debtor Should Be Authorized to Grant a Senior Priming Lien as Required by the DIP Loan Agreement

23. Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice

and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Adequate protection is designed to protect a secured creditor from diminution in the value of its collateral during the reorganization process. *In re Beker Industries Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). Thus, the loss of lien priority by a primed lender does not constitute a lack of adequate protection. *Anchor Savings Bank, FSB v. Sky Valley, Inc.*, 99 B.R. 117, 123 (N.D. Ga. 1989) ("… such a loss of priority is an inevitable by-product of a § 364(d) first lien - - some creditor which bargained for its first priority position will always be nudged aside."). Rather, the measure of whether a creditor's interest is adequately protected is the value of the lien in the debtor's property securing the creditor's claim. *Bankers Life Insurance Company of Nebraska v. Alyucan Interstate Corporation (In re Alyucan Interstate Corporation)*, 12 B.R. 803, 808 (Bankr. D. Utah 1981); *see also, United States Association of Texas v. Timbers of Inwood Forest Associates, Ltd.* 484 U.S. 365, 108 S. Ct. 636 (1988); *Beker*, 58 B.R. at 736.

24. Although, adequate protection is not defined in the Bankruptcy Code, § 361 sets forth three (3) examples of adequate protection: (1) making a cash payment or periodic cash payments; (2) providing additional or replacement liens; and (3) granting such other relief which will result in the realization of the "indubitable equivalent" of a creditor's interest in property. 11 U.S.C. § 361. The examples contained in § 361 of the Bankruptcy Code are merely illustrative, and hence are not designed to represent an exhaustive description of every available form of adequate protection. *See Beker*, 58 B.R. at 736. Rather, adequate protection is determined on the basis of the particular facts and circumstances of each case. Id. (application of adequate protection is "left to the vagaries of each case…."); *Besler v. Northwest Production Credit*

*Association (P.C.A.) (In re Besler)*, 19 B.R. 879, 883 (Bankr. S.D. 1982). Thus, the courts are provided with the necessary flexibility in applying adequate protection concepts readily to adapt "to varying circumstances and changing modes of financing" and the "infinite number of variations possible in dealings between debtors and creditors." *H.R. Rep.* No. 595, 95th Cong., 1st Sess. 339, reprinted in 1978 U.S. Code Cong. & Admin. News 5963, 6295.

25. Most courts have relied on §361(3) of the Bankruptcy Code in concluding that a creditor is adequately protected, if there is a sizeable equity cushion, i.e., the surplus of asset value over existing secured debt. *See, e.g., Snowshoe*, 789 F. 2d at 1088-90 (equity cushion of approximately $6 million, when coupled with trustee's proposed repayment of postpetition loan under § 364(d) of the Bankruptcy Code within five years, constituted adequate protection); *Mellor v. Pistole (In re Mellor),* 734 F. 2d 1936, 1401 (9th Cir. 1984) (equity cushion alone provided adequate protection); *Sky Valley*, 100 BR.R. at 114 (equity cushion of approximately $5.7 million constituted adequate protection); *In re 1606 New Hampshire Avenue Associates*, 85 B.R. 298, 310-11 (Bankr. E. D. Pa. 1988) (relatively stable equity cushion alone deemed sufficient to provide adequate protection); *Heritage Savings & Loan Association v. Rogers Development Corp. (In re Rogers Development Corp.)*, 2 B.R. 679, 683-85 (Bankr. E. D. Va. 1980) (equity cushion, which was stable and probably increasing in value over time, constituted adequate protection.

26. In *In re Dunes Casino Hotel*, 69 B.R. 784 (Bankr. D. N. J. 1986), the debtor sought to obtain post-petition financing secured by liens on its properties under § 364(d) of the Bankruptcy Code to provide for repairs, working capital, tax payments and other purposes. 69 Bankr. at 791. After concluding the debtor could not otherwise obtain necessary post-petition financing, the Court approved the debtor's proposed post-petition financing on the express

finding that an equity cushion of approximately $8 million on a worst case scenario alone would provide the secured creditor that was to be primed with adequate protection of its interest in the debtor's property. Id. at 796.

27. Similarly, the court in *Sky Valley*, supra, authorized post-petition financing on a a priming basis under § 364(d) of the Bankruptcy Code to enable the debtor, among other things, to fund operations and perform maintenance and improvements to its properties. 100 B.R. at 115. Holding that a $5.7 million equity cushion in the debtor's properties adequately protected the interest of the objecting creditor whose lien would be primed, the court pointedly noted: "In some circumstances, an equity cushion alone may provide adequate protection…. This is one." Id. at 114.

28. Here, there can be no serious question Phoenix is adequately protected. The Debtor's three condominium units plus the small office were valued at over $40 million approximately one year ago based upon comparisons of similar luxury residential condominiums in the neighborhood. See **Exhibit B**. Since a portion of the DIP Financing proceeds shall be utilized to pay all unpaid common charges and real estate taxes, only a portion of the DIP Financing will be senior to the Phoenix Judgment.[3] Only approximately $1 million of additional debt will be senior to the Phoenix Judgment which will leave tens of millions of dollars in equity to cover the Phoenix Judgment if this Court determines it is ultimately an allowed claim.[4]

29. A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(d) of the Bankruptcy Code.

---

[3] The unpaid common charges and real estate taxes outstanding as of the Petition Date are already senior to the Phoenix Judgment, as such the net effect of the DIP Financing will only result in approximately $1 million of additional debt senior to the Phoenix Judgment.

[4] The Phoenix Judgment was not based on any merits determination, but was entered *ex parte* via a confession of judgment signed by Spiros as part of an agreement with one of his daughters, at a time when Spiros was allegedly mentally incapacitated. Accordingly, the validity of the Phoenix Judgment will be subject to challenge in this Chapter 11 case.

*In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

30. As noted above and in the Antonia Declaration, the Debtor approached multiple potential lenders and no lender was prepared to make a loan without receiving a senior mortgage on the Debtor's retained condominium units. In short, there are no other options and the DIP Financing will enable the Debtor to pay necessary expenses and perform its obligations as sponsor. Based on the foregoing, in addition to evidence to be introduced at the interim hearing on the Interim Order if necessary, the Debtor submits the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtor is satisfied.

**II.  The DIP Lender Is a Good-Faith Lender Under Section 364(e).**

31. Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

32. As explained herein, and in the accompanying Antonia Declaration, the DIP Loan Agreement is the result of: (a) the Debtor's reasonable and informed determination the DIP Lender offered the most favorable terms on which to obtain vital postpetition financing, and (b) arms'-length, good-faith negotiations between the Debtor and the DIP Lender. The Debtor submits the terms and conditions of the DIP Loan Agreement are reasonable and appropriate under the circumstances, and the proceeds of the DIP Financing will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Loan Agreement other than as described herein. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by that section.

**III.   The Automatic Stay Should Be Modified on a Limited Basis.**

33. The proposed Interim Order provides the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lender to file and record its mortgage in order to perfect its senior lien against the Debtor's condominium units.

**IV. Failure to Obtain Immediate Interim Access to the DIP Financing Would Likely Cause Immediate and Irreparable Harm.**

34. Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

35. For the reasons noted above, the Debtor has an immediate postpetition need to obtain the funds required to pay the unpaid common charges on its retained units. The Debtor's inability to make common charge payments on its units has severely strained the building and made it extremely difficult for the condominium association to pay all the required expenses associated with the Property and threatens the Debtor's viability.

36. The Debtor requests the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtor, from and after entry of the Interim Order until the Final Hearing, to borrow $500,000 pursuant to the DIP Loan Agreement. This relief will enable the Debtor to start to repair its relationship with the other non-sponsor unit owners and avoid immediate irreparable harm and prejudice which will result from the Debtor's continued failure to pay common charges, pending the Final Hearing.

## REQUEST FOR FINAL HEARING

37. Pursuant to Bankruptcy Rule 4001(c)(2), the Debtor requests the Court set a date for the Final Hearing on **December 3, 2020**, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

38. To implement the foregoing successfully, the Debtor requests the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h) to the extent such rule is applicable.

## NOTICE

39. The Debtor will provide notice of the Motion to: (a) the Office of the U.S. Trustee for the Southern District of New York; (b) all of the Debtor's scheduled creditors; (c) counsel to the DIP Lender; (d) corporation counsel for the City of New York; (e) Constantina S. Papageorgiou, Esq., Vishnick McGovern Milizio LLP, 3000 Marcus Ave., Suite 1E9, Lake Success, NY 11042 and 570 Lexington Ave., Suite 1600, New York, NY 10022, guardian for Spiros, (f) all known parties that have asserted a lien on the Debtor's assets; and (g) any party that has requested service pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

40. No prior request for the relief sought in the Motion has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests the Court enter the DIP Financing Orders, granting relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: New York, New York
       November 16, 2020

                **TARTER KRINSKY & DROGIN LLP**
                *Proposed Attorneys for Axia Realty, LLC*
                *Debtor and Debtor-in -Possession*

                By: /s/ Scott S. Markowitz
                      Scott S. Markowitz, Esq.
                      1350 Broadway, 11th Floor
                      New York, New York 10018
                      (212) 216-8000
                      smarkowitz@tarterkrinsky.com