MEYERS TERSIGNI FELDMAN & GRAY LLP
*Attorneys for Antonia Milonas*
14 Wall Street, 20th Floor
New York, New York 10005
Direct: (203) 304-1678
Cell: (917) 992-3018
Anthony L. Tersigni, Esq.
atersigni@mtfglaw.com

TARTER KRINSKY & DROGIN LLP
*Proposed Attorneys for Axia Realty, LLC*
*Debtor and Debtor-in-Possession*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Scott S. Markowitz, Esq.
smarkowitz@tarterkrinsky.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

In re:

AXIA REALTY, LLC,

Debtor.

-----------------------------------------------------------------------x

Chapter 11
Case No.: 20-12511 (MG)

# JOINT MEMORANDUM OF LAW REGARDING AUTHORITY TO FILE

## Preliminary Statement

This joint memorandum is respectfully submitted on behalf of the Debtor, Axia Realty, LLC ("Axia") and Antonia Milonas ("Antonia"), one of its two 50% owners, as equity security holder, who initiated the filing of the instant chapter 11 case on behalf of Axia, acting as its sole manager due to the fact that her husband, Spiros Milonas ("Spiros"), the other 50% owner and former co-manager of Axia, is incapacitated.

On November 19, 2020, the Court held a hearing on Axia's motion for approval of

postpetition financing, during which there was discussion regarding Antonia's authority to initiate the filing of this case.

As discussed below, under the applicable provisions of Axia's operating agreement, the instant case was properly filed based on Antonia's authority to act as Axia's sole manager as a result of Spiros' incapacity.[1]

**Factual Background**

In or about August 2018, Antonia filed a breach of contract action against Spiros to enforce the support provisions of their prenuptial agreement (*Antonia Milonas v. Spiros Milonas*, Index No. 306820/2018 (Hon. Douglas E. Hoffman, J.)).[2] Antonia moved the court to appoint a guardian *ad litem* for Spiros alleging that he was being manipulated by his daughters from a prior marriage.

In April 2019, Justice Hoffman appointed Dr. Adam Bloom, Psy.D. ABPP, a forensic psychologist, to evaluate Spiros, and to assist the court in determining whether the appointment of a guardian *ad litem* for Spiros was necessary. Dr. Bloom submitted his confidential evaluation report on July 12, 2019.[3]

On August 23, 2019, Justice Hoffman appointed Evridiki Poumpouridis, Esq. as guardian *ad litem* for Spiros in the pending support action (Tersigni Declaration, 11/27/20, Exhibit 4). As stated in his decision (p. 15), Justice Hoffman's appointment of a guardian for Spiros was based

---

[1] Antonia and Axia believe that those who have raised the issue of authority in response to Axia's postpetition financing motion have withdrawn those objections; however, as the Court imposed a November 27, 2020 deadline to file a memorandum speaking to same, this memorandum is submitted, at the very least, prophylactically.

[2] The prenuptial agreement is incorporated by reference in Axia's operating agreement. However, none of the provisions of the prenuptial agreement bear on the issue of Antonia's right to act as Axia's sole manager as a result of Spiros' incapacity.

[3] Counsel for Antonia was given access to the Bloom report, but is not permitted to copy it for submission to this Court (Tersigni Declaration, 11/27/20, Exhibit 2). Counsel has requested that this Court requisition a copy of the Bloom report through the procedure established by Justice Hoffman so that it can be considered as part of the instant submission (*Id.* at ¶ 5).

on the court's conclusion that there was no question concerning the fact that Spiros is incapable of adequately prosecuting or defending his rights. Justice Hoffman further noted that Spiros, who is about to reach 92 years of age, is often severely confused, suffers from extensive cognitive difficulties and memory gaps, believes he is not part of any court proceedings and his condition is consistent with age related decline associated with Alzheimer's and/or Dementia (*Id.* at 11, 24).

Although the Bloom report was discussed in Justice Hoffman's decision to a limited extent, the full report furnishes much additional detail, based on two examinations of Spiros, interviews of collateral parties and review of medical records and other sources, and establishes the following, at a minimum:

- Spiros suffers from substantial cognitive impairment associated with Alzheimer's and dementia;

- Spiros has no awareness of what Axia is or represents;

- Spiros has no awareness of any legal matters related to the condominium units owned by Axia;

- Spiros has no awareness of what Phoenix Capital Finance Ltd. is or represents (in whose favor he signed a confession of judgment for approximately $2.2 million pursuant to a purported agreement signed with his daughter Sofia Milonas acting for Phoenix Capital Finance Ltd.);

- Spiros has no awareness of any of the circumstances involved in his current legal matters;

- Spiros has no understanding or appreciation of the nature and consequences of his cognitive impairment.

On November 4, 2019, Ms. Poumpouridis informed Justice Hoffman that she had concluded Spiros needed more than a guardian *ad litem* (Tersigni Declaration, 11/27/20, Exhibit

5). Ms. Poumpouridis stated that, based on his condition, Spiros is, "to say the least, vulnerable and susceptible to manipulation" and required not merely a guardian *ad litem* but an Article 81 guardian under the Mental Hygiene Law (*Id.* at 5-6). Counsel for Spiros stated that they had no objection to an Article 81 petition (*Id.* at 21).

Thereafter, on January 7, 2020, Ms. Poumpouridis filed a separate proceeding for the appointment of an Article 81 guardian for Spiros under the Mental Hygiene Law (*In the Matter of the Petition of Evridiki Poumpouridis*, Supreme Court, New York County, Index No. 500005/2020 (Hon. Mary V. Rosado, J.)). The Bloom report was made available by Justice Hoffman's chambers to Justice Rosado in the Article 81 guardianship proceeding. Following an evidentiary hearing held on August 10, 2020, Justice Rosado found, by clear and convincing evidence, that Spiros is incapacitated and issued an interim decision and order appointing Constantina S. Papageorgiou, Esq. as the guardian of his property for indefinite duration.[4] Ms. Papageorgiou has confirmed that she has been unable to have any meaningful conversation with Spiros due to his condition (Tersigni Declaration, 11/27/20, ¶ 8 and Exhibit 6).

## Summary of Argument

Under the express terms of paragraph 4(b) of Axia's operating agreement, Spiros' term as a co-manager of Axia ended as a result of his mental incapacity. Therefore, Antonia is the only manager authorized to act on Axia's behalf.

In that regard, the definition of "incapacity" set forth in paragraph 4(i) of the operating agreement is incorporated by reference in paragraph 4(c) of the operating agreement, *which relates to involuntary resignation*. By contrast, that definition is not incorporated by reference in paragraph 4(b), which, as noted, establishes the extent of each manager's term of office.

---

[4] On November 23, 2020, a copy of Justice Rosado's decision and order was submitted to the Court *in camera* and is incorporated by reference as part of the instant submission (Tersigni Declaration, 11/27/20, ¶ 7).

4

Therefore, in asserting Spiros' mental incapacity under paragraph 4(b), it is not necessary for Antonia to show a determination by two examining physicians selected by a "designated person" pursuant to paragraph 4(i). Otherwise, paragraphs 4(b) and 4(c) would be conflated, thereby rendering one or the other nugatory, an impermissible result under basic principles of contract law. *See* cases discussed in Point I, *infra*.

Even if, *arguendo*, the paragraph 4(i) definition of "incapacity" were to be deemed applicable, the requirement for a determination by two examining physicians selected by a "designated person" should be excused under the facts of this case since this Court, as a court of equity, will not require the performance of a meaningless and/or futile act.

Thus, it has been judicially determined, based on incontrovertible evidence, that Spiros is mentally incapacitated. His court appointed guardian has formally acknowledged that Spiros is incapacitated and incapable even of carrying on a meaningful conversation. Given those facts, requiring a determination by two physicians regarding Spiros' uncontested mental incapacity and his inability "to write or dictate a clear and sensible paragraph, or paragraphs, of one hundred words or more" would be an unnecessary and meaningless act. *See, e.g., U.S. v. Fairall*, 16 F.2d 328 (S.D.N.Y. 1926) (Learned Hand, J.) ("[E]quity does not insist upon such an idle formality ... [which] would be a mere waste of time and ought not be required").

Finally, compliance with a contractual provision may also be excused because of impossibility, particularly where such impossibility is caused by the other party to the contract. In the present case, the "designated person" for Spiros, Robert V. Corbett, who would be the one to designate two examining physicians to evaluate Spiros and confirm his mental incapacity, has been deceased for many years. Therefore, any insistence on strict compliance with paragraph 4(i) would require a showing by the objecting party that a successor to Mr. Corbett was named

by Spiros, as required under paragraph 4(i)(iv) of the operating agreement. In the absence of such a showing, even if paragraph 4(i) were deemed applicable, compliance with the literal procedure stipulated would be impossible and, for this additional reason, should be excused. *See, e.g., U.S. v. Russell*, 241 F.2d 879, 881 (1st Cir. 1957) ("Impossibility dispenses with the requirement, as well as manifest futility").

# POINT I

**THE RELEVANT PROVISIONS OF AXIA'S OPERATING AGREEMENT, PARAGRAPHS 4(B) AND 4(C), MUST BE READ SO AS TO ACCORD TO EACH OF THEM A REASONABLE AND EFFECTIVE MEANING. SO READ, PARAGRAPH 4(B) AUTHORIZES ANTONIA TO ACT AS AXIA'S SOLE MANAGER BASED ON SPIROS' UNCONTESTED MENTAL INCAPACITY. THE RESULT WOULD BE THE SAME UNDER PARAGRAPH 4(C) SINCE, UNDER THE FACTS PRESENTED, ANY REQUIREMENT FOR FURTHER MEDICAL EVALUATIONS OF SPIROS SHOULD BE EXCUSED.**

**A. The Applicable Rules of Contract Interpretation**

New York law adheres to the well-established rule of contract interpretation which requires that a contract be construed so as to give meaning and effect to all its provisions and avoids, whenever possible, the adoption of an interpretation that would render a contract term without force and effect, superfluous, meaningless or mere surplusage. *See, e.g., Corhill Corp. v. S.D. Plants, Inc.*, 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1 (1961) ("It is a cardinal rule of construction that a court should not 'adopt an interpretation' which would operate to leave a 'provision of a contract … without force and effect'"); *Spaulding v. Benenati*, 57 N.Y.2d 418, 419, 456 N.Y.S.2d 733 (1982) (same); *Laba v. Carey*, 29 N.Y.2d 302, 308, 327 N.Y.S.2d 613 (1971) (same); *Rentways, Inc. v. O'Neill Milk & Cream Co.*, 308 N.Y. 342, 347 (1955) ("'That interpretation is favored which will make every part of a contract effective'").

Similarly, the Second Circuit and other federal courts have long instructed that all

provisions of a contract should be accorded reasonable meaning and that an interpretation that would have the effect of rendering a contract provision superfluous, meaningless or mere surplusage "is not preferred and will be avoided if possible." *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988); *see also Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985) ("[A]n interpretation that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect"); *T.M. Real Estate Holdings, LLC v. Stop & Shop Supermarket Co.*, 543 F. App. 41, 42 (2d Cir. 2013) (summary order) ("We interpret a contract 'to give full meaning and effect to all of its provisions'"); *Systemized of New England, Inc. v. SCM, Inc.*, 732 F.2d 1030, 1034 (1st Cir. 1984) ("We take our guidance from the familiar principle that a court must favor interpretations which give meaning and effect to every part of a contract and reject those which reduce words to mere surplusage"); *Granite Construction Co. v. United States*, 962 F.2d 998, 1003 (Fed. Cir. 1992) ("It is well settled that a contract must be interpreted when possible as a whole in a manner which gives meaning to all its parts and avoids conflict or surplusage of its provisions"); *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed. Cir. 1985) ("This court must be guided by the well accepted and basic principle that an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless").

Moreover, "the rule is that 'where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect.'" *HSBC Bank USA v. National Equity Corp.*, 279 A.D.2d 251, 253, 710 N.Y.S.2d 20 (1st Dep't 2001).

**B. The Provisions of the Operating Agreement Relating to Incapacity**

Paragraph 4(a) of Axia's operating agreement vested management of the company

7

exclusively in the company's managers, Spiros and Antonia.[5]

Under paragraph 4(b), each manager was to *hold office* "until his or her death, incapacity or resignation." Incapacity is not defined.

Under paragraph 4(c), a manager is "*deemed to have resigned* if he or she shall become Incapacitated [sic-capitalized I in the original] (*as hereinafter defined*), in which case the other Manager shall act alone" (emphasis supplied).[6]

In accord with the authorities previously discussed, the two provisions in question, one of which expressly includes a definition of "incapacity" and the other of which does not, must be interpreted in a manner that gives each of the provisions a reasonable meaning and does not render either of them meaningless, superfluous or without force and effect.

Clearly, that is possible only if the two provisions do *not* incorporate the same definition of "incapacity." If the same definition of "incapacity" were to be applied under both provisions, the incongruous result would be as follows:

Under paragraph 4(b), the incapacitated manager would no longer hold office and, therefore, could no longer participate in the company's management. There would be only one manager and only that manager would be authorized to act for the company. Since the incapacitated manager was no longer a manager, deeming him to have resigned under paragraph 4(c) would be meaningless and of no force and effect and would constitute mere surplusage.

Under paragraph 4(c), the incapacitated manager would be deemed to have resigned, again leaving the other manager as the only one authorized to act on behalf of the company. By

---

[5] As previously noted, *supra* at fn. 2, the parties' prenuptial agreement is incorporated by reference in Axia's operating Agreement. However, the provisions of the prenuptial agreement do not conflict in any way with the provisions of the operating agreement relating to management of the company.

[6] The definition incorporated by reference in paragraph 4(c) is set forth in paragraph 4(i) of the operating agreement, which requires a determination of incapacity by two physicians selected by the manager's "Designated Person", including a finding that the incapacitated manager "shall not be able to write or dictate a clear and sensible paragraph, or paragraphs, of one hundred words or more ...."

definition, being deemed to have resigned, the incapacitated manger could no longer hold office, thus rendering paragraph 4(b) superfluous, meaningless and of no force and effect.

Accordingly, as noted, the same definition of "incapacity" cannot be applicable under both paragraphs 4(b) and 4(c).

Instead, paragraph 4(c) should be understood to apply where one of the managers might claim that the other was incapacitated and the claim was contested. In such a situation, it makes sense that there would be an agreed procedure under which the challenged manager, through his designated representative, would be able to select two physicians who would determine his condition. That would explain why the specified definition of "incapacity" is expressly incorporated by reference in paragraph 4(c), under which a manager, if found to be incapacitated, would be "deemed" to have resigned, *i.e.*, would be losing his management rights involuntarily, not by choice.

On the other hand, under paragraph 4(b), where, in a non-adversarial context, a manager might become physically or mentally incapacitated to the degree that his incapacity would be uncontested or reasonably obvious, then he would no longer hold office. As the text of paragraph 4(b) shows, the section would also apply in the event a manager chose to resign voluntarily, as opposed to being "deemed" to have resigned under paragraph 4(c).

In summary, it is submitted that the two provisions of the operating agreement in question can only be harmonized, as they must be, by concluding that the formulaic definition of "incapacity" incorporated by reference in paragraph 4(c) applies only under that provision and not under paragraph 4(b). The meaning of "incapacity" under paragraph 4(b) is undefined and should be determined on an *ad hoc* basis depending on the facts presented.

### C. Antonia's Authority to Act as Sole Manager Pursuant to Paragraph 4(b)

In the present case, as previously detailed, Spiros' incapacity has been conclusively established, has been judicially confirmed and is uncontested.

The Bloom report and Justice Hoffman's decision demonstrate beyond doubt that Spiros suffers from substantial cognitive impairment associated with Alzheimer's and dementia; that he has no awareness of what Axia is or represents; that he has no awareness of any legal matters related to the condominium units owned by Axia; that he has no awareness of what Phoenix Capital Finance Ltd. is or represents (even though he signed a confession of judgment for approximately $2.2 million in its favor pursuant to a purported agreement signed with his daughter Sofia Milonas); that he has no awareness of any of the circumstances involved in his current legal matters; and that he has no understanding or appreciation of the nature and consequences of his cognitive impairment.

Ms. Poumpouridis, Spiros' first guardian, informed Justice Hoffman that Spiros is, "to say the least, vulnerable and susceptible to manipulation" and required not merely a guardian *ad litem* but an Article 81 guardian under the Mental Hygiene Law (Tersigni Declaration, 11/27/20, Exhibit 5, pp. 5-6). Spiros' own counsel stated that they had no objection to the appointment of an Article 81 guardian (*Id.* at 21).

Thereafter, Justice Rosado found, based on clear and convincing evidence, that Spiros is incapacitated and she issued an interim decision and order appointing Ms. Papageorgiou as the guardian of his property. Ms. Papageorgiou herself has confirmed that she has been unable to have any meaningful conversation with Spiros due to his condition (Tersigni Declaration, 11/27/20, ¶ 8 and Exhibit 6).

Based on the uncontested facts, it is undeniable that Spiros is incapacitated and, therefore,

is no longer a manager of Axia. Accordingly, under paragraph 4(b) of the operating agreement, Antonia is Axia's sole manager and, as such, the only one authorized to act for Axia.

### D. The Effect of Paragraph 4(c)

Even under paragraph 4(c) of the operating agreement, Antonia must be determined to be Axia's sole manager and the only one authorized to act for it. Under that scenario, the requirement for a determination by two examining physicians selected by a "designated person" should be excused. As previously noted, this Court, as a court of equity, will not require the performance of a meaningless and/or futile act. *See U.S. v. Fairall, supra.* Given the undeniable fact that Spiros is incapacitated, requiring a determination by two physicians regarding Spiros' uncontested mental incapacity and his inability "to write or dictate a clear and sensible paragraph, or paragraphs, of one hundred words or more" would be an unnecessary and meaningless act.

Finally, compliance with the contractual provision for Spiros' examination by two physicians may also be excused because of impossibility. Since the "designated person" for Spiros, who would be the one to designate the two examining physicians, is deceased, insistence on strict compliance with paragraph 4(i) would require a showing by the objecting party that a successor to Mr. Corbett was in fact named by Spiros, as required under paragraph 4(i)(iv) of the operating agreement. In the absence of such a showing, compliance with the literal procedure of paragraph 4(i) would be impossible and, for this additional reason, should be excused. *See U.S. v. Russell, supra.*

## POINT II

### SINCE SPIROS' INCAPACITY TERMINATED HIS RIGHT TO ACT AS A CO-MANAGER OF AXIA, HIS COURT APPOINTED GUARDIAN STANDS IN THE SAME POSITION AND POSSESSES NO SUCH RIGHT

Paragraph 16 of Axia's operating agreement provides, in substance, that its provisions inure to the benefit of the parties and "their heirs, executors, administrators, legal representatives, successors and assigns." Whether Spiros' guardian is treated as his legal representative, successor or assignee, she stands in Spiros' shoes and can have no greater rights under Axia's operating agreement than Spiros himself. *See, e.g., Furlong v. Shalala*, 156 F.3d 384, 392 (2d Cir. 1998) ("[A]ssignee steps into the assignor's shoes and acquires whatever rights the latter had"); *O'Brien v. Argo Partners*, 736 F. Supp.2d 528, 535 (E.D.N.Y. 2010) (An assignee "takes all rights of the assignor, no greater and no less"); *In re Enron Corp.*, 379 B.R. 425, 435 (S.D.N.Y. 2007) ("[A]n assignee stands in the shoes of the assignor and subject to all equities against the assignor").

Accordingly, since Spiros, by reason of his incapacity, has ceased to be a manager of Axia, he has no governance rights. His guardian, as his legal representative/successor/assignee stands in his shoes and, like Spiros, can have no governance rights with respect to the management of Axia.[7]

---

[7] Since Spiros is not the Chapter 11 debtor in this case, no issue is involved regarding any possible transfer of governance rights from Spiros to the bankruptcy estate. *See* Theresa J. Pulley Radwan, *Members Only: Can a Trustee Govern an LLC When Its Member Files for Bankruptcy?*, Loyola L.A. L. Rev 1 (2019).

## Conclusion

For the reasons stated, Antonia Milonas is Axia's sole manager and, as such, was authorized to file the instant chapter 11 case on behalf of Axia.

Dated: November 27, 2020

> MEYERS TERSIGNI FELDMAN & GRAY LLP
> *Attorneys for Antonia Milonas*
> By: s/ Anthony L. Tersigni
> 14 Wall Street, 20th Floor
> New York, New York 10005
> Direct: (203) 304-1678
> Cell: (917) 992-3018
>
> TARTER KRINSKY & DROGIN LLP
> *Proposed Attorneys for Axia Realty, LLC*
> *Debtor and Debtor-in-Possession*
> By: s/ Scott S. Markowitz
> 1350 Broadway, 11th Floor
> New York, New York 10018
> (212) 216-8000
>
> MARC STUART GOLDBERG, ESQ.
> *Counsel to Meyers Tersigni Feldman & Gray LLP*
> s/ Marc Stuart Goldberg
> 2621 Palisade Avenue, Apartment 4A
> Bronx, New York 10463
> Cell: (917) 301-5134